## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Joseph G. Rosania, Jr.

| | |
|---|---|
| In re:<br><br>JEFFREY THOMAS MULLINS,<br>DAWN CHARITY MULLINS,<br><br>    Debtors. | Case No. 16-13773-JGR<br>Chapter 7 |
| TRANS-WEST, INC., dba Transwest<br>Truck Trailer RV,<br><br>    Plaintiff,<br><br>v.<br><br>JEFFREY THOMAS MULLINS,<br>DAWN CHARITY MULLINS,<br><br>    Defendants. | Adv. Pro. No. 16-01282-JGR |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

"Forget what they told you.  You want the truth, follow the money." — Roxanne Bland, Jar of Quotes, 2020.

The questions before the Court are whether the Defendants conspired to engage in an elaborate, fraudulent, secretive kickback scheme under which they stole at least $1 million from the Plaintiff over a three-and-one-half-year period, and, if so, whether such debt is excepted from discharge under 11 U.S.C. § 523(a)(2)(A), 11 U.S.C. § 523(a)(4), and 11 U.S.C. § 523(a)(6).  The Court has jurisdiction over this core matter pursuant to 28 U.S.C. §§ 1334, 157(a), and 157(b)(2)(I).

From November 19, 2019, through November 22, 2019, the Court conducted a four-day bench trial and heard the live testimony of eight witnesses, three of whom were experts, received the deposition testimony of an additional five witnesses, and admitted numerous exhibits.  The Court received a transcript of the trial in January 2020.  After consideration of the evidence, including a review of the trial transcript, all admitted exhibits, and seven depositions, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

**FINDINGS OF FACT**

## I.  Background

Plaintiff Trans-West, Inc., dba Transwest Truck Trailer RV ("Trans-West") is in the business of selling new and used recreational vehicles ("RVs"), automotive parts, and related services.  Trans-West has a business location in Frederick, Colorado.  Trans-West claims that its former RV sales manager, Defendant Jeffrey Thomas Mullins ("Mullins"), and his wife, Dawn Charity Mullins ("Mrs. Mullins"), conspired to engage in a fraudulent scheme and received traceable kickbacks in the form of checks and cash from certain RV wholesalers in an  amount of at least $1 million.  Mullins claims the receipts were either legal SPIFF payments, broker's fees, or not related to the sale of Trans-West RVs.  Mrs. Mullins claims to be an innocent bystander.

George Eidsness ("Eidsness") owns Trans-West.  He started in the automobile/truck business in a dealership in South Dakota in 1973.  He began as a car salesperson, then became a truck and trailer salesperson, and ultimately a general manager.  In 1995, he expanded Trans-West's operations by acquiring dealerships in New Mexico, Colorado, and Montana.

In 2005, Eidsness opened a new facility in Fredrick, Colorado to service Freightliner RVs.  In 2008, Trans-West began selling RVs at the Frederick location.  Since then, Trans-West has expanded its business by purchasing existing automobile dealerships in Colorado, Wyoming, Georgia, Missouri, and Canada.  As of the date of the trial, Eidsness testified that Trans-West had thirty-three business locations, which included twenty-three dealerships, twenty-five to thirty sales managers, and fifteen hundred employees (Trial Tr. day 1, 34:5-23).

Three different people served as RV sales manager for Frederick from 2008 to 2011.  Eidsness stated that Trans-West did not have anyone with sufficient knowledge, experience, and success in RV sales to maintain the position.  Accordingly, in 2011, Trans-West began its search for an experienced RV sales manager. (Trial Tr. day 1, 35:18-25).

## II.  Mullins's Employment

Andrew Lyons ("Lyons"), Eidsness's son-in-law, was the general manager of Trans-West in 2011 and during the relevant time frame.  He was familiar with Mullins, as Mullins was in the RV business in Texas, and Lyons had transacted wholesale business with Mullins on used RVs.  In September 2011, Mullins personally delivered an RV to Trans-West, applied for the RV sales manager position, and was hired shortly thereafter.

Eidsness personally interviewed Mullins, made an employment offer, and hired Mullins to be RV Sales Manager for Trans-West's Frederick location in October 2011 (Pl.'s Ex. 2).  Eidsness and Mullins testified that Mullins confided in Eidsness that he had a "rough upbringing" and troubled past as a young man but had met a woman, got married, found God, "turned his life around," and was a model citizen.  Eidsness stated that Trans-West, had, in the past, successfully hired employees with a checkered

background to provide the individuals with a second chance (Trial Tr. day 1, 39:23-40:7, 41:9-21, 139:8-15).

Mullins was hired because Lyons was generally was familiar with him from their prior business relationship, and Mullins represented that he had knowledge, experience, and success in the RV industry as the owner/operator of Pinnacle Coach, LLC ("Pinnacle Coach") in Texas. Eidsness and Lyons were "impressed with his knowledge of the industry" (Trial Tr. day 1, 39:19-24. 41:22-42:2).

Eidsness testified that Mullins negotiated a generous monthly base salary of $10,000, 25% of wholesale gross profits, and 5% of net retail sales after commissions, for his compensation package from Trans-West. Thus, Mullins's salary, based on a percentage of wholesale gross profits, did not require the wholesale division to be profitable on a net-profits basis. His salary while employed by Pinnacle Coach was $80,000, so he received a substantial increase in pay from Trans-West. Eidsness testified that he had never previously agreed to a percentage of wholesale gross profits for an RV sales manager but agreed to these terms to incentivize Mullins (Trial Tr. day 1, 37:11-38:7).

Mullins was given the Trans-West Employee Handbook dated October 7, 2010 (Pl.'s Ex. 4), at the time of his employment. Trans-West also later provided him with an updated Employee Handbook dated April 2013 (Pl.'s Ex. 5). Both handbooks, which Mullins received and signed, prohibited Trans-West employees from accepting gifts from customers, including, but not limited to, cash, or from engaging in acts that conflicted with the interests of Trans-West. Eidsness stated that Mullins never asked him any questions about the handbooks (Trial Tr. day 1, 42:19-23).

Mullins completed an Employment Application and subjected himself to a physical examination and drug test. He responded "no" to the question in the Employment Application asking whether he was ever convicted of a crime (Pl.'s Ex. 1, p. 1). Eidsness testified that Mullins lied on the Employment Application because, in Trans-West's subsequent investigation of Mullins, it discovered that he had a felony cocaine conviction. Mullins asserts that his answer was correct in that he was not previously convicted because he pled to a deferred adjudication, the terms of which he satisfied, which ultimately resulted in the dismissal of the criminal charge (Trial Tr. day 1, 41:5-8, 138:18-139:21).

Lyons testified that Mullins also misrepresented the size of the Pinnacle Coach dealership in Texas when he described it in his Employment Application (Pl.'s Ex. 1) as an owner-operated, full-size RV dealership, because Lyons later learned that it was only a "storefront" for Mullins (Trial Tr. day 2, 36:8-22).

## III.   Trans-West RV Operations 2011-2015

Mullins's duties and responsibilities as Trans-West's RV sales manager included buying, selling, and trading RVs to retail buyers and wholesale buyers at other dealerships, and advertising, marketing, and managing a group of salespeople. Although he reported to Lyons, Mullins was not required to obtain Lyons's advance approval or have a supervisor approve any retail or wholesale deal for the sale or purchase of RVs.

Eidsness or Lyons did have final authority if any issue was raised.  Eidsness testified that Mullins did not require the approval of Lyons for the sale of every unit on a day-to-day basis (Trial Tr. day 1, 38:13-39:15).  Mullins oversaw the RV operations for multiple Trans-West locations.

Trans-West paid Mullins a salary of approximately $175,000 in 2012, $163,000 in 2013, and $193,000 in 2014 (Pl.'s Ex. 7, pp. 2-4), more than double his salary at Pinnacle Coach.

Trans-West alleges that Mullins engaged in an illegal kickback and bribery scheme (the "Kickback Scheme"), beginning shortly after his employment began and continuing until he was terminated in June 2015, from which he received checks in the amount of $879,925 and unidentified cash deposits and wire transfers in the additional amount of $161,250 into personal and business checking accounts controlled by Mullins while employed by Trans-West.   Plaintiff's Exhibit 19 summarizes the payments Mullins received in excess of his salary from Trans-West as follows:

| Year | Payments | Cash Deposits | Total |
|------|----------|---------------|-------|
| 2011 | $87,500 | $2,700 | $90,200 |
| 2012 | $275,000 | $68,600 | $343,600 |
| 2013 | $94,500 | $82,950 | $177,450 |
| 2014 | $364,425 | $7,000 | $371,425 |
| 2015 | $58,500 | | $58,500 |
| **Total** | **$879,925** | **$161,250** | **$1,041,175** |

Trans-West claims that Mullins sold RVs at discounted prices to certain wholesale dealerships, and such wholesale dealerships paid kickbacks directly to Mullins in exchange for his sale of the RVs at discounted prices.  Trans-West also alleges that Mullins purchased RVs at inflated prices from certain wholesale dealerships and received kickbacks from such wholesale dealerships in exchange for his purchase of RVs at inflated prices.

Trans-West claims that during Mullins's tenure as RV sales manager, its RV division operated at a loss, but it earned a profit every year after Mullins was fired in June 2015.  Finally, Trans-West claims that the gross profit margin on Mullins's wholesale sales usually broke even or were at a loss when Trans-West's gross profit margin was approximately 7%-8% on RVs sold by other Trans-West salespeople.

Eidsness testified that the Trans-West RV sales department did not make a profit in the years it was managed by Mullins, 2011 through 2015.  Eidsness testified the loss was $700,000 in 2012, $1.5 million in 2014, and $2 million in 2015 (Trial Tr. day 1, 59:5-16).  His testimony was corroborated by the testimony of Lyons and Steven Pettley ("Pettley") (Trial Tr. day 1, 116:8-117:5), the current Trans-West RV sales manager who replaced Mullins in 2016.  They all testified that the Trans-West RV sales department operated at a profit in 2016, 2017, and 2018, after Mullins termination (Trial Tr. day 1, 43:3-16, 59:19-21).

Mullins finally admitted (after initial vehement denials to several parties) to receiving the funds after being shown the checks, but he claims that they are legal SPIFF payments, broker's fees, or not related to the wholesale sale of Trans-West RVs. He disputes that any of the cash deposits were from wholesale RV dealerships as part of a Kickback Scheme. He claims that the cash deposits were from pending Pinnacle Coach RV deals, the consignment sale of Pinnacle Coach equipment, the sale of a Rolex watch for $5,000, and gambling proceeds. Mullins has no documents to support any of these claims and did not claim gambling proceeds on his tax income tax returns for the years in question. The critical issue is whether the payments and cash deposits were kickbacks or legal SPIFF payments, broker's fees, or otherwise not related to the wholesale sale of RVs.

Lyons joined Trans-West in 2004. After managing a used truck horse trailer operation, he was promoted to general manager of the Frederick location. His duties were to oversee the entire operation, which included the truck service department, truck parts, truck sales, horse trailer sales, RV sales, RV parts, and RV service. He was Mullins's immediate supervisor during the entire time that Mullins was the RV sales manager. Lyons testified that in the timeframe in question, 2011 through the end of 2014, Mullins had day-to-day authority over wholesale RV purchases and sales (Trial Tr. day 2, 29:4-7).

Trans-West began monitoring wholesale sales more carefully in the summer of 2014 due to the mounting losses. When confronted about the lack of profitability, Lyons said Mullins always made promises of "greater things to come" (Trial Tr. day 2, 40:20-41:2). Lyons testified that Mullins's authority to sell RVs on a wholesale basis was ultimately revoked at the end 2014 because the division was not profitable for four years. He stated that the Trans-West inventory was over-aged and grew in dollars and units under Mullins's tenure (Trial Tr. day 2, 40:2-11).

Pettley joined Trans-West as a salesperson in 2007 and replaced Mullins as RV sale manager in 2016. While he was a salesperson, he reported to Lyons and Mullins. Pettley testified that he was aware Mullins was selling RVs on a retail and wholesale basis. He also stated that Trans-West made more money on the retail sale.

Even though he worked under Mullins for several years, Pettley testified that he was not aware Mullins was receiving checks and cash payments directly from wholesalers, and that Mullins never told him he was receiving checks and cash payments directly from wholesalers (Trial Tr. day 1, 109:5-11). In fact, the Court finds Mullins concealed that he was receiving checks and cash directly from wholesalers and did not tell anybody at Trans-West, including Eidsness; Lyons; Pettley; Bradley Land ("Land"), a former Trans-West salesperson; or Robert Kovac ("Kovac"), another former Trans-West salesperson.

Pettley testified that the most he received in one year from legal SPIFFs was between $12,000 and $15,000 (Trial Tr. day 1, 121:6-13), the SPIFF programs were well known to all at Trans-West (Trial Tr. day 1, 119:9-121:5), he received Internal Revenue Service Form 1099's for the legal SPFFs from the payor, and he reported the income in his income tax returns. Significantly, Pettley testified that he never received a payment directly from an RV wholesaler (Trial Tr. day 1, 111:15-25).

Trans-West also introduced the deposition testimony of Land into evidence. Land was previously employed by Trans-West as a salesperson from 2011 to 2015 and left voluntarily on good terms. He reported to Lyons and Mullins. He stated that Trans-West paid legal SPIFFs and referral fees, which are common in the industry. He indicated that the difference between legal SPIFFs and referral fees, on the one hand, and kickbacks, on the other hand, was that Trans-West knew about and authorized the legal SPIFFs and referral fees.

Land stated that he had a close personal relationship with Mullins while they worked together at Trans-West. He testified that Mullins never told Land he was receiving checks and cash from wholesalers while they worked together. He asked Mullins about the kickbacks after Mullins was fired and, although Mullins "actually denied it to me" (Land Dep. 143:18-20), Land testified that Mullins admitted later he did receive those amounts (Land Dep. 148:6-20). He also testified that it was "not OK" to receive kickbacks. His most damaging testimony was that he thought what Mullins did to Eidsness in getting that much money was "sickening" (Land Dep. 133:6-23).

## IV.    The Tip

Mullins was a hot commodity in the RV business. He was featured on the cover of RV Business Magazine for May/June 2015, and there was a feature article about him in the magazine. Eidsness was alerted to the potential that Mullins was engaging in a Kickback Scheme when he was attending an RV convention in 2015 after the magazine was published. Mullins was featured in the opening video presentation for the convention. Afterwards, a fellow dealer approached Eidsness and told him, "your guy is rotten." This dealer stated that Mullins was accepting kickbacks from other dealers and he knew this because Mullins asked a salesman at the dealer's company for a kickback to do business with him (Trial Tr. day 1, 54:22-25, 56:9-10, 56:17-21).

Mullins vigorously objected to the admission of the other dealer's statement to Eidsness at the convention "tipping him off" that Mullins was defrauding Trans-West, arguing that the statement was inadmissible hearsay under Fed. R. Evid. 801 and 802, incorporated herein by Fed. R. Bankr. P. 9017.

Under Fed. R. Evid. 801(c), hearsay means a statement that:

(1) the declarant does not make while testifying at the current trial or hearing; and
(2) a party offers in evidence to prove the truth of the matter asserted in the statement.

Fed. R. Evid. 802 states, "[h]earsay is not admissible unless any of the following provides otherwise, a federal statute; these rules; or other rules prescribed by the Supreme Court."

Hence, a statement by a third party not testifying at trial offered to prove the truth of the matter asserted is inadmissible hearsay, due to concerns about the reliability of the precise wording of the out-of-court statement and because the party is not in court and

subject to cross examination by the adverse party.  Cross examination is a process known as the "engine of truth" in American Jurisprudence.  In the words of John Henry Wigmore, "cross examination is beyond a doubt the greatest legal engine ever invented for the discovery of truth." 3 J. Wigmore, Evidence § 1367, p. 27 (2d ed. 1923). Here, the fellow dealer was not in court and subject to cross examination by Mullins.

However, the Court overruled the objection and allowed the statement to be admitted into the record because the statement was not admitted for the truth of the matter asserted.  Instead, the statement was admitted into evidence to show the impact of the statement on Eidsness and what he did as a result of the fellow dealer's statement.

Thus, the statement was admitted into evidence to show the "effect on the listener." It is not hearsay because it was not admitted for the truth of whether Mullins was defrauding Trans-West.  Rather, it was admitted for the limited purpose of showing its effect on the listener, especially where the listener's state of mind after the statement is relevant to an issue in the case.  *United States v. Cruz-Diaz*, 550 F.3d 169, 176–77 (1st Cir. 2008) (citation omitted); *Reynolds v. Steward St. Elizabeth's Med. Ctr. of Bos., Inc.*, 364 F. Supp. 3d 37, 56 (D. Mass. 2019) (citation omitted); *see also* 4 Stephen A. Saltzburg et al., Federal of Rules of Evidence Manual, § 801.02[1][f] (4th ed. 2006) ("If a statement is offered for its effect on the listener, in order to explain the listener's conduct, it does not matter whether the declarant is telling the truth.").  This holding does not contravene the right to cross examination because the statement is not offered for the truth of the matter asserted and not considered to be testimonial.

This revelation caused Trans-West to retain counsel and an investigator to review the matter.  The preliminary investigation found that Mullins was receiving money into various personal and business accounts far in excess of what he was being paid by Trans-West.  Thereafter, Trans-West contacted the Weld County District Attorney's Office to investigate and bring criminal charges (Trial Tr. day 1, 56:22-57:10).

Eidsness testified that he had never seen a kickback scheme in his years in the automotive industry, it was not a standard practice, and the Court observed at trial that Eidsness was very distraught as to why Mullins would defraud him (Trial Tr. day 1, 52:11-24, 53:16-24, 54:5-7). When Eidsness personally confronted Mullins with the Kickback Scheme, Mullins adamantly denied it and claimed that he was the victim (Trial Tr. day 1, 57:11-19).  Thereafter, Trans-West terminated Mullins, filed a state court civil action, and waited for the results of the criminal process (Trial Tr. day 1, 58:16-21).

## V.     The Kickback Scheme

Trans-West alleges that Mullins received kickbacks through  checks and cash from three primary wholesalers: Troy "Max" Davis ("Davis") of Ranger RV ("Ranger"); Christian Cecil ("Cecil") of Texas RV and, later, Neal's Autoplex; and Scott Buchanan ("Buchanan") of Southwest Luxury Coach Sales, LLC ("Southwest").  Davis and Davis are individuals whom Mullins met in Texas in the RV industry before Mullins moved to Colorado for the Trans-West RV sales manager position.  Thus, Davis and Cecil both had prior personal relationships with Mullins.  Davis was a former business partner. Cecil was Mullins's close friend and gambling buddy.

## A. Trans-West's Expert

Trans-West called Joshua Harrison ("Harrison"), a certified public accountant (CPA), who was qualified as an expert witness under Fed. R. Evid. 702 in the areas of account reconstructions, economic damages, fraud investigation, forensic accounting, and complex financial analysis. Harrison has testified approximately thirty times as an expert witness in cases in federal and state courts (Trial Tr. day 2, 101:22-102:2). He also holds the designations of a certified fraud examiner (CFE), chartered financial analyst (CFA), and is accredited in business valuation (ABV) (Trial Tr. day 2, 102:24-103:3).

Harrison was tasked to: (i) determine whether there were kickbacks from RV wholesale dealers to Mullins; (ii) match payments to Mullins with Trans-West's purchases or sales of RVs to determine if these transactions had better or worse gross profit margins when compared to other Trans-West transactions; and (iii) trace the disposition of the funds received from the kickbacks (Trial Tr. day 2, 104:8-105:10).

Harrison reviewed thousands of pages of documents, including pleadings, documents produced in discovery, bank records, and deposition transcripts. He also interviewed Trans-West employees and reviewed documents produced by Southwest, including Southwest's tax returns (Trial Tr. day 2, 106:4-17).

In preparing his expert witness report, Harrison compared a list of Mullins's wholesale transactions in the relevant time period provided to him by Trans-West, 2011 through 2015 (Pl.'s Exs. 64 (purchases) and 65 (sales)), against the dates of checks and cash receipts into Mullins's various personal and business bank accounts. He specifically identified the bank accounts in his report, which included demonstrative charts and summaries (Pl.'s Exs. 63, 64, and 65). Harrison's expert testimony was fact-based, detailed, very credible, and greatly assisted the Court.

Generally, Harrison concluded that Mullins received $879,000 in checks and an additional $176,000 in cash deposits from wholesale RV dealers (Trial Tr. day 2, 107:2-16). He testified that there was a total of twelve to fifteen wholesale dealers who dealt with Mullins (Trial Tr. day 2, 112:12-16). However, most of the checks were from three specific wholesale dealers: Ranger (Davis), Texas RV/Neal's (Cecil), and Southwest (Buchanan) (Trial Tr. day 2, 112:17-24).

Harrison also concluded that the gross profit margins on Mullins's sales to RV wholesale dealers were far lower than the overall RV business of Trans-West, which had margins in the 7-8% range (Trial Tr. day 2, 107:17-21).

Finally, Harrison concluded that the "vast majority" of the kickback proceeds were spent on consumer goods, as detailed below (Trial Tr. day 2, 107:22-108:3).

Ranger RV is an RV dealership in Texas. Between 2011 and 2015, Mullins sold thirty-three RVs to Ranger RV on a wholesale basis and purchased fourteen RVs on a wholesale basis from Ranger RV. In that same time period, Mullins received thirty-eight checks from Ranger, totaling $179,750 (Trial Tr. day 2, 121:13-25).

Texas RV/Neal's are RV dealerships in Texas. Cecil was associated with Texas RV/Neal's as an independent contractor engaged in wholesale transactions. Between 2011 and 2015, Mullins sold thirty RVs to Texas RV/Neal's on a wholesale basis and purchased nine RVs from Texas RV/Neal's on a wholesale basis. In that same time period, Texas RV/Neal's issued thirty checks to Mullins, totaling $305,750 (Trial Tr. day 2, 120:1-23).

Southwest is an RV dealership in Phoenix, Arizona. Between 2011 and 2015, Mullins sold forty-four RVs to Southwest on a wholesale basis and purchased eleven RVs from Southwest on a wholesale basis. In the same time period, Southwest issued twenty-seven checks to Mullins, totaling $263,925 (Trial Tr. day 2, 121:22-123:16). Harrison's analysis of Southwest's income tax returns revealed that, although only 15% of Southwest's business in 2013 was with Trans-West, Southwest derived 75% of its profit from the wholesale transactions with Trans-West. In 2014, Southwest's profits from wholesale transactions with Mullins were 49% of its total profits, even though only 15% of its business was with Trans-West (Trial Tr. day 2, 130:3-9, 131:5-132:6); (Buchanan Dep. 78:17-83:10, June 20, 2016). Trans-West claimed Southwest's business plan was to defraud Trans-West.

Harrison testified that the Certified Fraud Examiner's Manual defines a kickback as a "payment to an employee usually in a position of authority in exchange for favorable business transactions or otherwise a business influencing, and these payments are unknown or unauthorized or both by the employer, and furthermore, the purpose of the kickbacks often is to benefit the payor by way of getting a better deal than he would otherwise and a portion of the economic benefit is then paid as a kickback to the employee, and often at the expense of an employer" (Trial Tr. day 2, 108:13-109:4).

Harrison testified that the term "SPIFF" is an industry-specific term which denotes a salesperson incentive payment, usually offered by an RV manufacturer or dealership, to a salesperson to sell specific inventory. A SPIFF payment is common, legal, disclosed to all parties, and reported to the Internal Revenue Service as income to the payee of the SPIFF (Trial Tr. day 2, 108:4-12).

Harrison opined that two types of kickbacks were present here and described the selling and purchasing kickback schemes in detail. In the context of a selling employee, a kickback scheme occurs when the salesperson sells inventory at less than fair value and, in exchange, gets a portion of the savings as a kickback. Here, Harrison testified that the payments had all the hallmarks of a kickback in that they were discreet, not known to the employer, and to the employer's detriment (Trial Tr. day 2, 109:5-12).

In the context of a purchasing employee, a kickback scheme occurs when the employee purchases inventory from a seller at a higher price than the value of the inventory and then receives a kickback in exchange for a portion of the gain from the seller's point of view. Here, again, Harrison testified the payments had all the hallmarks of a kickback in that they were discreet, not known to the employer, and to the employer's detriment (Trial Tr. day 2, 109:13-18).

In order to reach his conclusions, Harrison examined the joint business and personal accounts of Mullins and Mrs. Mullins, the bank account of Pinnacle Coach, the

bank account of Mrs. Mullins's life-coaching company, Mullbuch, LLC ("Mullbuch"), and a business account of Davis (Trial Tr. day 2, 110:2-111:16).

Harrison testified that the transfers fit the definition of a kickback, and there was no "plausible explanation" as to why Mullins would be receiving checks personally from RV wholesale dealers if he was doing legitimate business on behalf of his employer, Trans-West, in "arms-length" transactions (Trial Tr. day 2, 113:4-14).

Harrison further testified that almost all of the checks received by Mullins from the wholesalers (except three or four which had a VIN number on the transaction line) did not have any notes on the transaction lines, which is another one of the hallmarks of a kickback scheme, being discreet and yielding as little information as possible about the purpose of the payment (Trial Tr. day 2, 115:25-116:25). He testified that normally, and especially in cases of commercial transactions involving large checks, there is a reference on the transaction line for the purpose of the payment (Trial Tr. day 2, 116:16-18).

Harrison also testified that cash payments are the preferred payment method in kickback schemes because it is impossible to track the source (Trial Tr. day 2, 113:15-114:18). However, here the amount of cash transferred to Mullins as part of the Kickback Scheme was small in relation to the checks transferred, because the three dealers were out of state in Texas and Arizona. The Court surmises that the three dealers did not want to send significant sums of cash through the mail.

Harrison also performed a gross profit margin analysis and found that the gross profit margins on Mullins's wholesale deals where funds were transferred to Mullins, were lower or at a loss compared to the overall business of Trans-West, where RVs had gross profit margins of 7-8%. He reported that most of the sales to Texas RV/Neal's and Southwest were at a loss (Trial Tr. day 2, 123:17-126:3).

On the issue of where the money ended up, Harrison focused on a joint checking account of Mullins and Mrs. Mullins with Chase in 2012, their primary account (Pl.'s Ex. 63, Schedule 6, attached). He found that, in addition to Mullins's net salary from Trans-West in 2012 in the amount of $132,810, there were other deposits in the amount of $174,414 and cash deposits in the amount of $65,700 from other sources, for a total of $372,924 deposited into the joint Chase checking account in 2012 (Trial Tr. day 2, 132:7-133:23).

Then, Harrison found transfers to other accounts in the amount of $29,674, checks in the amount of $49,678, ATM debit card withdrawals in the amount of $156,072, other electronic withdrawals in the amount of $96,979, and other cash withdrawals in the amount of $39,868, for a grand total of withdrawals in the amount of $372,271 in 2012. At the end of 2012, the balance of the account was $457 (Trial Tr. day 2, 133:6-134:9).

Finally, Harrison opined that Trans-West's claimed damages of approximately $1 million from the Kickback Scheme, based on the check and cash transfers, are too low. First, although Mullins received checks from twelve to fifteen dealers, Harrison focused on Ranger, Texas RV/Neal's, and Southwest, the three dealers who made the "vast majority" of payments to Mullins (Trial Tr. day 2, 134:10-21).

Second, Harrison concluded that Trans-West suffered far greater losses than the portion of the kickbacks paid to Mullins because those amounts only represented part of the economic detriment to Trans-West, since the other parties to the scheme, Ranger RV, Texas RV/Neal's, and Southwest, also received an economic benefit, as reflected in the tax returns of Southwest.

An example he provided to the Court is a vehicle worth $100,000, which the salesperson agrees to sell for $50,000 in return for a kickback of $20,000. While the total benefit to the salesperson is $20,000, the total loss to the dealer is $50,000. So, there is a "kickback" of a portion of the ill-gotten gain. In the Court's view, this explains why Trans-West's losses for the years 2011-2015 were far greater than the kickbacks received by Mullins (Trial Tr. day 2, 135:5-10).

## B. Mullins's Expert

Mullins called Catherine Middlemist ("Middlemist), a certified public accountant, as an expert witness in the areas of accounting and auditing. The Court permitted Middlemist to sit in the courtroom during Harrison's testimony. Mullins claimed that the purpose of her expert testimony was to report the results of her audit of Harrison's conclusions in his expert testimony and expert report. At trial, Trans-West objected to qualifying Middlemist as an expert witness under the requirements of Fed. R. Evid. 702, because she was not an expert in the areas of fraud examination or forensic accounting, which were two specific areas of Harrison's expertise that he employed to prepare his analysis.

Under Fed. R. Evid. 702, a witness who is qualified as an expert by knowledge, skill, experience or training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Although not specifically referred to in Trans-West's oral motion to exclude the expert testimony of Middlemist, Trans-West's arguments that the expert testimony of Middlemist should be excluded on the grounds the testimony was unreliable and irrelevant were premised on the two seminal Supreme Court cases interpreting Fed. R. Evid. 702, *Daubert v. Merrell Dow Pharm.*, *Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

These cases instruct the trial court to act as a gatekeeper to ensure the expert testimony is both reliable and relevant and not a waste of time. *Daubert*, 509 US at 597. The first step is to determine whether the expert is qualified "by knowledge, skill, experience, training or education." Fed. R. Evid. 702. The second step is to determine

11

whether the expert's opinion is reliable based on sufficient facts, reliable methods, and the expert has reliably applied the methods to the facts of the case.  Fed. R. Evid. 702.

The Court overruled the objection, qualified Middlemist as an expert in the areas of accounting and auditing, and allowed her to testify as an expert witness because it wanted to hear the results of the audit of Harrison's conclusions from an accountant and auditor, provide Mullins and Mrs. Mullins with a full and fair opportunity to present their defense, and this was a bench trial in which case the Court retains wide latitude to decide how to apply the requirements of Fed. R. Evid. 702.  *Kumho Tire,* 526 U.S. at 142 (citation omitted); *see also Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 330 (5th Cir. 2010) ("[T]he importance of the trial court's gatekeeper role is significantly diminished in bench trials, as in this instance, because, there being no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence. … [A trial judge has] wide latitude in determining the admissibility of expert testimony….") (internal quotation marks and citations omitted).

Middlemist's expert witness report was referred to as Defendant's Exhibit G.  Her general methodology was to attempt to discredit Harrison's conclusions.

First, Middlemist questioned that Harrison obtained the Mullins wholesale purchase and sales records from a query he devised with Trans-West employees (Pl.'s Exs. 64 and 65), inferring that the query request was incomplete, in-accurate, or the employees selectively provided data, none of which inferences were supported by the evidence.  Pettley testified as to the simple methodology employed to provide the information.  The Court does not know how else Harrison would obtain the source information on Mullins's wholesale purchases and sales.

Second, Middlemist claimed that Harrison was "force matching" Mullins's Trans-West wholesale purchases and sales to deposits in Mullins checking accounts.  In Defendant's Exhibit C to Defendant's Exhibit G, she identified four wholesale transactions in this category out of hundreds where the sale from Trans-West occurred after the deposit of a check in Mullins bank account (Trial Tr. day 3, 21:10-22:3).

Third, Middlemist claimed to have had a difficult time tracing costs for the gross profit margin analysis.  Since her fraud examination and forensic accounting experience is limited, and her review of documents was non-existent, the Court is not surprised.

Fourth, Middlemist noted three inconsistencies in Harrison's description of the content of the transaction lines in three checks out of the hundreds of checks at issue.

Fifth, Middlemist claimed that in Defendant's Exhibit A to Defendant's Exhibit G, $142,750 of the checks made payable to Mullins from certain wholesale RV dealers were not kickbacks because they were checks for legitimate Pinnacle Coach business transactions.  However, Middlemist admitted that she did not review any documents on this issue, and that she only relied on Mullins for her conclusions on the Pinnacle Coach transactions.  Harrison testified that he had not been provided with any documents to substantiate any payments to Pinnacle Coach, and no documents concerning the Pinnacle Coach payments were tendered to the Court during the entire trial (Trial Tr. day 2, 156:22-157:12).

On cross examination, Middlemist admitted that she only spent a modicum of time on the matter, only reviewed a limited number of documents, and did not review any deposition transcripts. Middlemist could not challenge the number of wholesale RV sales and purchases between Mullins and Ranger, Texas RV/Neal's, or Southwest, the number of checks these RV wholesale dealers sent to Mullins, or the **reasons** for such transfers, which is the heart of Harrison's Kickback Scheme conclusions.

Middlemist has not testified as an expert in federal or state court in the last five years. She testified that she was not familiar with the Certified Fraud Examiners Manual. Since her background in forensic accounting and fraud examination is non-existent, her qualifications were lacking.

Further, her review of the relevant documents in this case was quite limited, she assumed facts without documents, and any errors or inconsistencies she identified in Harrison's analysis were *de minimis*. In summary, her methodology was not clear to the Court, her testimony was not based on sufficient facts, and, ultimately, her testimony did not particularly assist the Court.

## VI.    The State Court Civil Matter

Trans-West sued Mullins and Mrs. Mullins in Weld County District Court on June 11, 2015, styled *Trans-West, Inc. dba Trans-west Truck Trailer RV, v. Jeffrey T. Mullins and Charity B. Mullins*, Case No. 2015CV30505 (the "State Court Case"). The State Court Case was stayed when Mullins and Mrs. Mullins filed a Chapter 7 bankruptcy case on April 20, 2016, and the State Court Case was administratively closed on August 9, 2016.

In the State Court Case, Trans-West recorded a notice of *lis pendens* on Mullins and Mrs. Mullins's home (the "Property"). Thereafter, the parties entered into a stipulation which provided that the Property would be sold and net proceeds held in escrow, subject to release only upon agreement of the parties or a court order (D.'s Ex. I).

An order approving the stipulation was entered in the State Court Case on May 24, 2018. The escrowed funds have not been released by the escrow agent, and a dispute has arisen between the parties as to whether this Court has jurisdiction to award the escrowed funds to Trans-West as part of any damages it might award. There is no question that this Court has jurisdiction over the parties to the stipulation.

Trans-West argues that pursuant to paragraph 16 of the stipulation, the escrowed funds can be released by "an order of any court," including this Court. Mullins and Mrs. Mullins argued at trial that the escrowed funds can only be released by agreement of the parties or an order from the state court which entered the order approving the stipulation in the State Court Case.

In Trans-West's second amended complaint, filed on March 21, 2019 (Doc. 69), it made the following allegations:

> 28.  As part of the State Court case, Transwest recorded a notice of lis pendens and amended notice of lis pendens (the "Lis Pendens") on Debtors' home (the "Property").

> 29.  Transwest recorded the Lis Pendens because, upon information and belief, Debtors used the funds they misappropriated from Transwest to pay for improvements to the Property.

> 30.  On May 24, 2018 the parties entered into a stipulation and filed the same in the State Court Case (the "Stipulation").  The Stipulation provided that Debtors intended to sell the Property and, after paying off the debt on the Property, Debtors would put the net proceeds into an escrow account.

> 31.  The State Court granted the Stipulation on May 24, 2018.

> 32.  The Debtors sold the Property.  The net proceeds are currently being held by the escrow holder.  The Stipulation provides that the net proceeds shall be held in escrow and no proceeds shall be released to either party without the written agreement of the parties or a court order.

> 33.  Transwest is entitled to the funds being held in escrow as partial recovery for damages caused by the Debtors.

In paragraph 1 of their answer to second amended complaint, filed on April 2, 2019 (Doc. 71), Mullins and Mrs. Mullins submitted the following answer:

> 1. Defendants admit paragraphs 1-10, 26-28 and 30-33 of the second amended complaint.

Judicial admissions are formal concessions in the pleadings that are binding upon the party making them.  *Keller v. United States*, 58 F.3d 1194, 1999 n.8 (7th Cir. 1995).  Mullins and Mrs. Mullins unequivocally admitted the clear and concise allegations of paragraphs 28 and 30-33 of the second amended complaint.  They may not be controverted at trial.  *Id.*  Thus, the above unequivocal judicial admission resolves this issue in favor of Trans-West.

## VII.    The Bankruptcy Case and Adversary Proceeding

Mullins and Mrs. Mullins filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on April 20, 2016.

Trans-West timely commenced the instant adversary proceeding against Mullins and Mrs. Mullins on July 19, 2016.  Mullins was indicted on November 21, 2016, for felony

14

crimes related to the Trans-West transactions by a Weld County Grand Jury (the "Criminal Case").  The adversary proceeding was held in abeyance from February 15, 2017, until January 29, 2019, to allow the Criminal Case to conclude.

As set forth above, Trans-West filed a second amended complaint on March 21, 2019, and Mullins and Mrs. Mullins answered on April 2, 2019, and the adversary proceeding advanced to trial.

## VIII.   The Criminal Case

After performing an independent investigation, a Weld County Grand Jury returned an eleven-count felony indictment against Mullins (Pl.'s Ex. 61) on November 21, 2016. The first and central count of the felony indictment was for theft in the operation of the Kickback Scheme.  The other  crimes alleged relating to the Kickback Scheme were for filing false Colorado state tax income tax returns, failing to file Colorado state income tax returns or pay taxes, failing to report the kickbacks as income, and tax evasion for failing to pay income taxes on the kickbacks for the years 2011 through 2015, inclusive. Thereafter, the Weld County District Court ordered the indictment filed (Pl.'s Ex. 61, p. 3).

On November 1, 2018, almost two years after the indictment was filed, Mullins pled guilty to three Class 5 felony[1] counts of tax evasion and agreed to: (i) file income tax returns, and (ii) pay restitution to Colorado Department of Revenue in exchange for a deferred sentence and dismissal of the remaining criminal counts, including the felony theft count (Pl.'s Ex. 61).[2]  Mullins testified that the amount of restitution was $85,000 and proudly stated that he is current on his restitution payments (Trial Tr. day 3, 97:19-98:25).

In his Written Waiver and Guilty Plea, dated November 1, 2018, Mullins stated that he believed the District Attorney had enough evidence to convict him at trial (Pl.'s Ex. 61, pp. 12-13), and he admitted that fact at trial (Trial Tr. day 2, 15:18-18:17).

Prior to trial, Mullins filed a motion in limine, seeking to exclude Exhibit 61 from the evidence before the Court (Doc. 93).  He argued that the indictment and waiver and guilty plea were inadmissible because they were not relevant under Fed. R. Evid. 401, 402, and 403, and they were inadmissible hearsay under Fed. R. Evid. 801 and 802.  Trans-West countered that Exhibit 61 was relevant to a key issue in the case and fit within the exception to hearsay under Fed. R. Evid. 803(22).  The Court denied the motion in limine (Doc. 108).

---

[1] The presumptive range of punishment for a Class 5 felony is imprisonment for a period of one to three years.  C.R.S. § 18-1.3-401(1)(a)(V)(A).

[2] In hindsight, the Court believes the Weld County District Attorney's Office did the sensible thing in crafting the plea bargain.  The Weld County District Attorney has limited resources and could not devote such limited resources to a five-day jury trial with three expert witnesses on the complex Kickback Scheme with a criminal conviction standard of beyond a reasonable doubt.  Mullins pled guilty to numerous felonies and agreed to amend his income tax returns and pay restitution to the State of Colorado.  Also, the Weld County District Attorney knew that Trans-West was waiting in the wings to pursue its civil fraud case.

Fed. R. Evid. 401 states that evidence is relevant if:

> (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and
> (b) the fact is of consequence in determining the action.

Fed. R. Evid. 402 states that "[r]elevant evidence is admissible unless any of the following provides otherwise: the United States Constitution; a federal statute; these rules; or other rules prescribed by the Supreme Court.  Irrelevant evidence is not admissible."

Fed. R. Evid. 403 states that "[t]he Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Fed. R. Evid. 803 states, in relevant part, that the following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

> (22) Judgment of a Previous Conviction. Evidence of a final judgment of conviction if:
> (A) the judgment was entered after a trial or guilty plea, but not a nolo contendere plea;
> (B) the conviction was for a crime punishable by death or by imprisonment for more than a year;
> (C) the evidence is admitted to prove any fact essential to the judgment; and
> (D) when offered by the prosecutor in a criminal case for a purpose other than impeachment, the judgment was against the defendant.
> The pendency of an appeal may be shown but does not affect admissibility.

First, that Mullins pled guilty for filing false income tax returns and evading the payment of income taxes due to his receipt of the kickbacks to avoid going to jail on the felony theft charge has probative value, is relevant, and bears directly on the fraud claims in this case.  Mullins claims as his defense in this case that the SPIFFs were legal, yet he did not report them on his Colorado state income tax returns or pay taxes on them and pled guilty to felony charges for the same.

Moreover, there is no danger of substantial unfair prejudice in a bench trial, especially where, as here, the Court was aware that there was a criminal matter pending involving Mullins because the within adversary proceeding was stayed for over two-and-one-half years pending the outcome.  Trans-West has asserted that, as one of many badges of fraud, the SPIFFs were illegal as established by Mullins's failure to report or pay taxes on them in his income tax returns.

16

Additionally, under Fed. R. Evid. 803(22), evidence of a final judgment of conviction is not inadmissible hearsay if the judgment was entered by a guilty plea, the conviction was for a crime punishable by imprisonment for more than one year, and the evidence was offered to prove a fact essential to the judgment.  Exhibit 61 falls within this definition because the judgment was entered on a guilty plea, the crime was punishable by imprisonment for more than one year, and Exhibit 61 was offered to prove a fact essential to the judgment that the SPIFFs were illegal.

## IX.   Tax Fraud Issues

Mullins failed to report the kickbacks as income on his federal and state income tax returns.  In 2012, he received kickbacks in the amount of $275,000 and only reported his W-2 income from Trans-West on his 2012 income tax return (Pl.'s Ex. 22).  The Internal Revenue Service corrected his 2012 income tax return due to unreported gambling winnings (Pl.'s Ex. 24).

In Mullins's initial 2013 income tax returns, although he received kickbacks in the amount of $192,450, he only reported gross business income in the amount of $96,500 on his Schedule C for "**consulting**," subject to business deductions in the amount of $32,868 (Pl.'s Ex. 26).

Mullins testified on cross examination that he had no documents to support the business expenses for 2013 (Trial Tr. day 2, 11:1-12:3), and that he only amended his 2013 income tax return (D.'s Exs. B and C) after he was indicted and prior to sentencing (Trial Tr. day 2, 12:4-8, day 3, 94:17-22).

In Mullins's initial 2014 income tax returns, he reported business income in the amount of $380,783 for "SPIFF" (Pl.'s Ex. 27).  He reported the kickbacks as business income so he could deduct business expenses from them.  In 2014, Mullins deducted $166,611 in business expenses (Pl.'s Ex. 27), for which Mullins testified on cross examination that he is unable to account (Trial Tr. day 2, 12:11-14:20).  Also, on cross examination, Mullins admitted that he only amended his income tax returns for 2014 (D.'s Exs. D and E) after he was indicted and prior to sentencing (Trial Tr. day 3, 95:2-12).

## X.   Mullins's Defenses

### A.  To SPIFF or Not to SPIFF

Eidsness (who was qualified as an expert witness in the industry on this subject due to his forty-six years in this business), Lyons, Harrison, Land, and Pettley were credible, consistent, and convincing in their testimony in distinguishing between a legal SPIFF and a kickback.  They also described referral fees as fees paid by a dealer to a customer for the referral of a new customer.

The term SPIFF stands for salesperson incentive payment.  It is either paid by a RV manufacturer or dealer to a salesperson to sell a "slow product."  It is never paid by a purchaser.  Trans-West is always aware of the manufacturer and dealer SPIFFs via broadcast e-mails, and the manufacturer always issues an Internal Revenue Service

Form 1099 miscellaneous income to the salesperson. Further, SPIFFs are never paid in wholesale deals.

Mullins even testified that the only time he asked Eidsness about Trans-West's SPIFF policy was when he asked about a SPIFF request from a **manufacturer** (Trial Tr. day 3, 69:3-24). On cross examination, Mullins admitted that he did not ask or tell Eidsness or Lyons about payments to himself from wholesalers.

As an example of the typical scope of legal SPIFFs, Pettley testified that he received $15,000 in SPIFFs in 2018 as RV sales manager for Trans-West, for which he received IRS Form 1099s, reported the income on his income tax returns, and paid taxes.

When Trans-West asked Mullins at trial whether he told Pettley about the checks he was receiving from the RV wholesalers, Mullins committed a slip of the tongue when he stated, "Mr. Pettley was a salesperson for me so I didn't disclose **my personal business at all**" and admitted that he kept the checks **secret** from Trans-West (Trial Tr. day 1, 181:19-182:5).

The only people who are claiming that the payments were legal SPIFFs are Mullins, Davis, Cecil, and Buchanan.

## B. Mullins's Story

Mullins formed Pinnacle Coach in 2008 to buy and sell RVs. Mullins touted that through his talent, success, and hard work in the RV industry for Trans-West, he grew the sales force of the dealership while employed by Trans-West from 3 to 15 salespeople (Trial Tr. day 3, 64:1-9). He said that the RV dealership went from 122nd to 8th in the nation per the rankings of Statistical Survey, Inc., and was the only ranked dealer in the northern part of the country (Trial Tr. day 3, 64:22-65:6). However, Eidsness testified that, as the sales grew, so did the losses (Trial Tr. day 1, 59:5-16).

Mullins testified he was so successful that he was featured in numerous publications, he and Eidsness were featured on the cover of an RV trade magazine, and Mullins was featured in the opening video presentation for an RV conference in 2015.

Mullins testified that Trans-West specifically allowed SPIFFs, and Lyons knew about and approved everything he was doing. This self-serving testimony is contrary to the testimony of Eidsness, Lyons, and Pettley. Mullins also stated that Trans-West does not enforce the employee manuals because it allows legal SPIFFs. He contended that he and the other RV wholesale dealers were involved in numerous, complicated, multiple vehicle trades, the terms of which only Mullins and the other RV wholesale dealers understood.

Mullins called Kovac, a former Trans-West salesperson from 2013 to 2019, as a witness in his defense for the purpose of eliciting testimony from Kovac that Mullins fairly valued trades (Trial Tr. day 3, 52:14-21), he had no reason to complain about the way Mullins managed Kovac's deals (Trial Tr. day 3, 54:3-9), Trans-West does not rigidly enforce the employee manuals on SPIFFs (Trial Tr. day 3, 46:17-47:18), and RV wholesalers "absolutely" paid SPIFFs (Trial Tr. day 3, 46:7-12).

Prior to trial, Trans-West filed a motion in limine to exclude the testimony of Kovac on the basis that his appearance as a witness for Mullins was not timely disclosed, and it was deprived of the opportunity to depose him (Doc. 99). Mullins contended that his pre-trial disclosures indicated he might call any former Trans-West employee as a witness at trial. The Court denied the motion (Doc. 108) and allowed Kovac to testify because it was disclosed that Mullins might call former Trans-West employees at trial and, again, to give Mullins and Mrs. Mullins their "day in court."

On cross examination, Kovac admitted that he never did any wholesale sales (Trial Tr. day 3, 58:15-16), he never received funds from wholesalers in the five-plus years that he was employed at Trans-West, including from Davis, Cecil, or Buchanan (Trial Tr. day 3, 58:17-59:3), and Mullins did not tell Kovac that he was receiving funds from wholesalers (Trial Tr. day 3, 59:4-6).

Kovac was Mullins's friend who tried to help him by testifying. While he testified that wholesalers paid SPIFFs, the Court discounted Kovac's testimony because he admitted that he never received a single SPIFF from a wholesaler in the five years that he was employed by Trans-West.

Mullins testified that the checks he received from the three primary RV wholesalers were for SPIFFs, finder's fees, or broker's fees (Trial Tr. day 3, 72:4-73:11). He claimed that he did not ask for the payments, there was no specific arrangement with the three primary RV wholesalers to pay a set amount, and he humbly accepted whatever amount they deemed appropriate.

Mullins never referenced or explained the nature of the alleged "broker's fees" at trial.

Mullins also claimed that one of the checks he received in the amount of $55,000 from Texas RV was from the sale of a personal vehicle to Davis (Trial Tr. day 3, 80:16-82:24). However, Mullins admitted that the deposit slip for the deposit of this check does not reference payment for a truck (Trial Tr. day 3, 93:7-94:9). Further, despite motor vehicles being titled and registered through appropriate governmental agencies, no documentation was produced evidencing the transfer of title to a personal vehicle.

Finally, Mullins parroted the theme of his defense that Trans-West has not been damaged, as the checks and cash were not the property of Trans-West because they came from the wholesalers, not Trans-West (Trial Tr. day 3, 74:6-24). He used the same flawed reasoning for his excuse as to why he failed to inform Trans-West of the checks and cash he was receiving; it was his "personal business".

Is that not one of the badges of fraud of a secretive kickback scheme? Failing to inform your employer of the receipt of at least $1 million in "SPIFFs" from wholesalers? It is no wonder that the wholesale division had substantial losses while it was managed by Mullins. Eidsness testified that "if Jeff Mullins would have returned the first gift he received from Southwest, we wouldn't be sitting here today because that would have ended it" (Trial Tr. day 1, 84:6-16).

What Mullins ignores is that he stole Trans-West's property when he stole the approximate 7-8% of gross profits earned for Trans-West by honest salespeople, which should have been paid to Trans-West, not Mullins. He also stole Trans-West's property when he purchased inventory at a cost of more than fair market value because, as Harrison testified, that simply deferred a loss for Trans-West.

Mullins also gave flimsy explanations for the cash deposits, with no documents to support such claims. He claims that none of the cash came from the three primary RV wholesalers. Rather, the cash deposits were from the sale of a Rolex watch for $5,000 (although there were deposit slips of $2,000 and $3,000 from this sale?), unreported gambling winnings, and the sale of remaining Pinnacle Coach RV inventory and miscellaneous personal property in Texas.

## C. The Other Players

In addition to Land, the deposition testimony of Davis, Cecil, and Buchanan was admitted into evidence. Trans-West traveled to Texas to depose Davis and Cecil, and to Arizona to depose Buchanan and Land.

Davis, Cecil, and Buchannan all "lawyered up." Their counsel vigorously objected during the depositions, and the Court characterizes their testimony as "evasive" and "combative." The threesome only dealt with Mullins at Trans-West. They all owned their own businesses, or worked independently, so they reported to no one and had no supervision. None disputed the payments made to Mullins by check. How could they?

There would be no reason to "lawyer up" if the transactions were legitimate and could be easily documented and explained. Proof of this point is that Land did not retain counsel for his deposition because he was not part of the Kickback Scheme and had nothing to hide; not so with Davis, Cecil, and Buchanan.

### i. Davis: The Former "Business Partner"

Davis met Mullins in 2008. They were business partners in Pinnacle Coach in Texas (Davis Dep. 15:1-16-25). Davis was formerly in the farming and ranching business and wanted to try something different. He met Mullins through a Pinnacle employee (Davis Dep. 17:12-18). Davis had no familiarity with the RV business; he was the "money man" and Mullins the "brains" in the Pinnacle Coach deals. They split the profit 40/60. At some point, Mullins and Davis shuttered Pinnacle, and Mullins formed Ranger.

Then, Mullins left Ranger to join Trans-West. Davis is currently the sole owner of Ranger, which is in the wholesale RV business (Davis Dep. 9:18-19, 11:4-20). Davis testified that he did business with Trans-West, buying and selling RVs at wholesale, and all of his dealings were with Mullins. He claims that he and Mullins never discussed doing RV wholesale business before Mullins left Pinnacle and joined Trans-West (Davis Dep. 25:1-26:24).

Regarding SPIFFs, Davis stated that when you are making money with people with whom you are doing business, you SPIFF them, and the payments were not always related to a specific RV transaction (Davis Dep. 40:1-41-15). He further stated that

SPIFFs are commonplace, they do not affect the prices of RVs, Mullins never asked for the SPIFFs, and they were always paid by Ranger by checks, not cash (Davis Dep. 54:18-24).  It was just the way things were done.  He did not know whether he was paying Mullins as a broker or as a salesperson of Trans-West.  He did not receive any SPIFFs from Mullins (Davis Dep. 51:3-21).

**The Court does not believe Davis.**  Ranger and/or Davis personally wrote thirty-eight checks to Mullins in a three-year period, totalling $179,750.  The Court does not believe that Ranger, or Davis personally, ever issued an Internal Revenue Service Form 1099 to Mullins.  The Court notes that the memo in many of the transaction lines on the checks from Ranger to Mullins were blank or for "broker's fees."  The word "SPIFF" does not appear on any transaction line.  Not surprisingly, Davis struggled to explain the difference between a SPIFF and broker's fee, answering, "I paid him SPIFFs as—I don't—whatever" (Davis Dep. 113:20-114:2).

It strains credulity to believe the payments were voluntary, in no set amount, and made from the "goodness of Davis's heart."  He was the money man in the RV deals and admitted he had no experience in the RV industry, so he did what Mullins told him to do in the Kickback Scheme.  Finally, he claimed one of the largest checks that was issued by Ranger to Mullins for $20,000 (with a blank transaction line) was not for RV business.  He did not provide any justification for the $20,000 check.

In all respects, Davis was the perfect person to conspire with Mullins to defraud Trans-West.  The Court finds that Davis and Mullins set up the Kickback Scheme before Mullins moved to Colorado.

### ii.    Cecil: The "Gambling Buddy"

Cecil, on the other hand, had extensive experience in the RV business.  He met Mullins in 2009, and they became gambling buddies.  He also "lawyered up" and was evasive in answering questions, but the theme of the deceit was the same as with Davis.

Cecil only dealt with Mullins at Trans-West (Cecil Dep. 37:1-15).  Leonard Zak owned Texas RV, where Cecil worked as an independent salesperson.  Then, Cecil moved on to Neal's Autoplex in 2012 or 2013 because Texas RV closed.  He continued the Kickback Scheme while he was with Neal's Autoplex.

The SPIFF payments were always by check, never by cash.  He would pay Mullins a SPIFF for a customer referral or if Mullins found an RV.  The SPIFFs were not based on a set percentage or formula.  Rather, they were whatever Cecil saw fit (Cecil Dep., 26:18-28-12), or "just whatever he felt at the moment" (Cecil Dep. 49:11-21).  Of course, Mullins never asked for a SPIFF (Cecil Dep. 41:3-8).

Some SPIFFs were paid by Texas RV, but most were from Cecil's personal checking account.  None of the checks from Texas RV had any information on the transaction lines.  He did not know or remember why Texas RV was sending checks to Pinnacle Coach in 2011 (Cecil Dep. 53:19-54:12).

Zak testified that payments were made directly to Mullins at the direction of Cecil for expenses or costs associated with an underlying RV transaction. He did not know of the specific bases for the payments (Zak Dep. 33:8-37:10).

**The Court does not believe Cecil.** Texas RV and/or Cecil wrote thirty checks to Mullins over a four-year period, totaling $305,750. The fraud started immediately within one week after Mullins was employed by Trans-West on September 26, 2011. Texas RV wrote four checks to either Mullins or Pinnacle Coach in October 2011, starting on October 3, 2011, totaling approximately $30,000, four checks in November 2011, totalling $30,000, and four checks in December 2011, totaling $25,500 (Pl.'s Ex. 17), for a three-month total of $85,000.

The Court makes similar observations regarding Cecil that it does not believe the story that SPIFFs were not based on a set percentage or any formula; it was whatever Cecil saw fit. Cecil and Mullins were Las Vegas gambling buddies and, from the timing of the 2011 checks, certainly set up their scheme before Mullins started at Trans-West.

In all respects, Cecil was another ideal person to conspire with Mullins to defraud Trans-West. Mullins testified that some of the checks were for repayment of gambling debts, although that notation does not appear on the transaction line of a single check, and Mullins has no documents to support that claim.

One example is a questionable $20,000 check. Cecil's wife, Tiffany, wrote a check in the amount of $20,000 to Mullins on July 19, 2013, and, in the transaction line, indicated that the check was for a "finder's fee." Cecil testified that this check, in fact, repaid a personal gambling debt to Mullins (Cecil Dep. 65:11-66:10). Mullins testified that the term "finder's fee" appeared on the check because Cecil did not want his wife to know that he owed money to Mullins for a gambling debt. So, if Cecil was lying to his wife about the purpose of a $20,000 check, why would the Court believe his testimony?

### iii. Buchanan: The "New Person"

Mullins had previous relationships with Davis and Cecil in Texas before Mullins was employed by Trans-West, but not with Buchanan. Buchanan was the last player to join the Kickback Scheme. Buchanan owned Southwest, which was formed in 2011 (Buchanan Dep. 12:19-22, March 7, 2016). The scheme is the same in that Buchanan owned Southwest, so he had no supervision.

Buchanan testified that he first spoke with Mullins in February 2013 (Buchanan Dep. 20:6-7, March 7, 2016).

Southwest issued twenty-seven checks to Mullins in 2013, 2014, and 2015, totalling $263,925 (Pl.'s Ex. 17).

The relationship between Mullins and Buchanan shows the level of Mullins's greed.[3]  It wasn't enough that he was perpetrating the Kickback Scheme with his Texas buddies, Davis and Cecil; he wanted more.  Why not? He had not been caught so far during the first two years of his fraudulent scheme.  Mullins, ever the salesperson, had gained the trust and confidence of Trans-West.

In the very first transaction between Mullins and Southwest, known as the "bad ass" coach deal, Southwest purchased a 2008 Newell RV at auction for $501,000 on October 1, 2013.  Three weeks later, on October 23, 2013, Southwest sold the 2008 Newell RV to Trans-West for $590,000, for a profit to Southwest and loss to Trans-West of $89,000.  Mullins "hooked" Southwest (Pl.'s Exs. 59 and 60).

Thereafter, Southwest sent three checks to Mullins, beginning on December 23, 2013, and in February 2014, totalling $23,500, with no memos in the transaction lines.  In this deal, the email correspondence between Mullins and Buchanan on September 29, 2013, stated, "It's a bad ass coach. Let's get it" (Pl.'s Ex. 59).

This language reflects the "actual fraud" in the conspiracy to defraud Trans-West.  Mullins and Buchanan acted in concert to allow Southwest to purchase the Newell RV at the lower price, then turn around and sell the same coach to Trans-West at an inflated price.  Why didn't Mullins, on behalf of, and out of loyalty to his employer, Trans-West, not just buy the 2008 Newell at auction for $501,000 and sell it to Southwest or another third party for $590,000?  Because Buchanan and Mullins, acting together, structured the deal to guarantee a substantial profit for Southwest in exchange for the kickback to Mullins (Buchanan Dep. 73:5-77:3, March 7, 2020).

This also illustrates Harrison's conclusions that the amount received by Mullins is only part of the damages Trans-West suffered when Mullins received kickbacks in the amount of $23,500, and Southwest pocketed the difference of $65,500 in this deal.  Trans-West was rightfully entitled to receive the entire $89,000 that the players in the Kickback Scheme retained.

An example of a transaction, showing the other side of the Kickback Scheme, occurred in 2014.  Southwest sold a coach to Trans-West on June 20, 2014, for $535,000.  Because Mullins purchased the coach at an inflated price, it could not be sold for profit at retail.  So, over nine-months later, Trans-West sold the coach back to Southwest on April 2, 2015, for $490,000, at a $45,000 loss (Buchanan Dep. 86:5-87:9, March 7, 2016).  Mullins received two checks from Southwest in April 2015, totalling $15,000, and two checks in May 2015, totalling another $15,000.

The sworn explanations of Mullins and Buchanan for this deal is that it was part of a multi-vehicle transaction involving confusing paperwork referred to as "deal jackets," the terms of which only they understood.  They also testified that there may have been repairs and upgrades.  The Court would add another hallmark of a kickback scheme is

---

[3] Greedy people like Mullins are never satisfied, and, in pursuit of material possessions, they show no empathy and have no limits.  "Earth provides enough to satisfy every man's needs, but not every man's greed." — Mahatma Gandhi.

the use of confusing documentation as a "smokescreen" to hide the true nature of the fraud.

Buchanan testified similarly to Davis and Cecil that the amount of the SPIFF is determined solely by Southwest (Buchanan Dep. 36:25-38:22, March 7, 2016), there were no cash payments (Buchanan Dep. 36:23-24, March 7, 2016), and although Southwest claims it made SPIFF payments to other parties, it produced no documents to support that claim (they were in Buchanan's office) (Buchanan Dep. 33:22-36:4, March 7, 2016).  Southwest issued checks to Mullins right up until Mullins was terminated by Trans-West.

Buchanan testified that the March 2, 2015 check from Southwest to Mullbuch in the amount of $7,000 was made payable to Mullbuch at the instruction of Mullins (Buchanan Dep. 32:6-33:10, March 7, 2016).

Buchanan also testified that he would have paid Trans-West if Mullins had requested that he do so (Buchanan Dep. 38:3-5, March 7, 2016).  This is a classic example of a self-serving statement.  **The Court does not believe Buchanan**.

The trial adduced specific, concrete evidence of the Kickback Scheme employed by Mullins and Southwest with respect to the purchase of inventory at a price that was too high, and the sale of inventory at a price that was too low.

## XI.   Mrs. Mullins's Defenses

Mullins and Mrs. Mullins were married during the entire time that Mullins was employed by Trans-West (Trial Tr. day 2, 62:6-13), had joint bank accounts, and filed joint income tax returns (Trial Tr. day 2, 62:14-63:3).

Mrs. Mullins testified that "Jeff always had additional income" (Trial Tr. day 3, 102:23-103:1), it was his business (Trial Tr. day 3, 103:11-17), and she "did not keep up with that" (Trial Tr. day 3, 109:14-17).  She said she was surprised when he was fired by Trans-West (Trial Tr. day 3, 104:21-25).

However, Mrs. Mullins was an employee of Pinnacle with check signing authority on the company's bank account (Trial Tr. day 2, 63:20-65:7). She was involved in the winding down of Pinnacle Coach in late 2011 (Pl.'s Ex. 9), but Pinnacle had an active bank account, through which kickbacks flowed through May 2012 (Trial Tr. day 2, 69:21-71:25).

Mrs. Mullins testified that she was a stay-at-home mom (Trial Tr. day 3, 102:6-10), and she was not involved in any of Mullins's business dealings (Trial Tr. day 3, 103:11-17).  However, Texas RV wrote a check to Pinnacle in the amount of $23,700 on May 10, 2012, and Pinnacle wrote a check in the amount of $10,000 to Mrs. Mullins personally on the same day (Pl.'s Ex. 8, p. 230; Ex. 34).  There was no documentary or other evidence of why Texas RV would write a check to Pinnacle, and Pinnacle would contemporaneously write a check to Mrs. Mullins.

Mrs. Mullins also deposited cash in the amount of approximately $28,000 into the joint personal account at Chase (Pl.'s Ex. 33), over a three-year period from 2011 through 2014. This was the joint account which was the subject of Harrison's 2012 analysis, through which over $400,000 flowed in one year (Pl.'s Ex. 63, Schedule 6). She denied that she made the cash deposits and had no explanation for the cash deposits other than to say, "this was eight years ago" (Trial Tr. day 2, 79:5-7).

Mrs. Mullins personally received another kickback check. Southwest made a $7,000 check, dated March 2, 2015, payable to Mullbuch, which Mullbuch deposited into its bank account. Mrs. Mullins formed Mullbuch in 2014 (Trial Tr. day 2, 73:5-8). Then, Mullbuch wrote a check to Mrs. Mullins in the same amount on the next day (Pl.'s Ex. 37, p. 994). Mullbuch was a life-coaching company, which Mrs. Mullis testified never generated income in 2014 or 2015 (Trial Tr. day 2, 74:1-5). There was no documentary or other evidence showing why Southwest would write a check to Mullbuch, and Mullbuch would contemporaneously write a check to Mrs. Mullins.

Mrs. Mullins was evasive, combative, and never made eye contact with the Court. She enjoyed the fruits of the fraud and embarked on lavish consumer spending sprees, examples of which are represented by Plaintiff's Exhibits 36, 39, and 43-46. Plaintiff's Exhibit 36 reflects $25,841 of ATM and debit card withdrawals on Mrs. Mullins's debit card from June 2014 through November 2014.

Additional examples of her overt participation in the Kickback Scheme include the following checks drawn on the joint Chase account: (i) Plaintiff's Exhibit 39 is a check in the amount of $5,000, dated July 1, 2013, for a down payment on a house they bought, signed by Mrs. Mullins (Trial Tr. day 2, 87:16-18); (ii) Plaintiff's Exhibit 43 is a check in the amount of $1,000, dated May 22, 2014, for house painting, signed by Mrs. Mullins; (iii) Exhibit 44 is a check in the amount of $2,000, dated July 5, 2014, for yard work, signed by Mrs. Mullins; (iv) Exhibit 45 is a check in the amount of $7,850, dated August 7, 2014, for backyard construction, signed by Mrs. Mullins; and (v) Exhibit 46 is a check in the amount of $1,405, dated August 22, 2014, for tile work, signed by Mrs. Mullins.

Finally, Mrs. Mullins signed all original and amended tax returns, as well as the residential loan application (Pl.'s Ex. 42) (Trial Tr. day 2, 63:4-6).

## XII.   Trial

The Court either heard or reviewed the testimony of thirteen witnesses. Trans-West called Eidsness, Lyons, Pettley, Harrison, Mullins, and Mrs. Mullins at trial. Harrison was called as an expert witness. Eidsness was called as a fact witness and as an expert witness in the RV industry on SPIFFs.

Trans-West designated and offered into evidence portions of deposition testimony of Land (February 5, 2016, Phoenix, AZ), Cecil (February 18, 2016, Dallas, TX), Davis (November 11, 2016, Dallas, TX), Buchanan (March 7, 2016 and June 20, 2016, Phoenix, AZ), and Leonard Zak ("Zak") (February 5, 2015, Dallas, TX), pursuant to Fed. R. Civ. P. 32(a)(4)(B) and (6), incorporated herein by Fed. R. Bankr. P. 7032. The deposition of Buchanan was taken twice, and there was a transcript of Land's testimony in the state court case, so there were two transcripts of Buchanan and Land's testimony.

Mullins called Middlemist, Kovac, Mrs. Mullins, and himself at trial.  Middlemist was called as an expert witness.  Mullins also designated and offered into evidence portions of deposition testimony of Land, Cecil, Davis, Buchanan, and Zak, pursuant to Fed. R. Civ. P. 32(a)(4)(B) and (6), incorporated herein by Fed. R. Bankr. P. 7032.

Fed. R. Civ. P 32(a)(4), in relevant part, provides:

Unavailable Witness.  A party may use for any purpose the deposition of a witness, whether or not a party, if the court finds:

…

(B) that the witness is more than 100 miles from the place of hearing or trial or is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition….

Fed. R. Civ. P. 32(a)(6) provides:

Using Part of a Deposition. If a party offers in evidence only part of a deposition, an adverse party may require the offeror to introduce other parts that in fairness should be considered with the part introduced, and any party may itself introduce any other parts.

The admission of the deposition testimony and cross designations complies with the above rules.  The Court notes that it spent hundreds of hours unraveling this tale, and it was an arduous process to review hundreds of pages of cross-designated deposition testimony, with hundreds of pages of attached exhibits.

## XIII.   Trans-West v. Southwest

Trans-West sued Southwest and Buchanan in Adams County District Court on October 6, 2015, in a civil action styled, *Trans-West, Inc., v. Southwest Luxury Coach Sales, LLC, and Scott Buchanan*, Case No. 15CV31647.  Southwest and Buchanan removed that action to the United States District Court for the District of Colorado on October 8, 2017.  Thereafter, the civil action proceeded in the United States District Court for the District of Colorado, in a civil action styled, *Trans-West, Inc., dba Trans-West Truck Trailer RV v. Southwest Luxury Coach Sales and Scott Buchanan*, Civil Action No. 15-2233-RM-MJW.

Trans-West brought claims against Southwest and Buchanan under many theories.  Pertinent here are Trans-West's tort claims against Southwest and Buchanan, arising out of the Kickback Scheme for: (i) aiding and abetting breach of fiduciary duty; (ii) fraud; (iii) conversion; (iv) civil theft; (v) civil conspiracy; (vi) constructive trust; and (vii) unjust enrichment.  Southwest and Buchanan moved for summary judgment on the tort claims, Trans-West responded, and the parties fully briefed the matter.

26

On August 23, 2017, United States District Court Judge Raymond P. Moore entered an Order on various motions, including Southwest and Buchanan's motion for summary judgment on the tort claims. In a detailed ruling, he concluded that Trans-West had provided sufficient evidence upon which a jury could find Southwest and Buchanan liable on the tort claims of aiding and abetting breach of fiduciary duty, fraud, civil conspiracy, constructive trust, and unjust enrichment claims. Therefore, Judge Moore denied Southwest and Buchanan's motion for summary judgment on such tort claims (October 23, 2017 Order at pp. 32-38), and allowed such tort claims to proceed to a jury trial.

Judge Moore further found that Trans-West sufficiently established damages attributable to the actions of Southwest and Buchanan to withstand summary judgment. He found that a reasonable jury could find the payments Southwest and Buchanan made to Mullins to be "bribes" or "kickbacks" (October 23, 2017 Order at pp. 25-28).

However, Judge Moore granted partial summary judgment in favor of Southwest and Buchanan on the civil theft and conversion claims. On the civil theft claim, he ruled that because Trans-West never possessed the disputed funds at issue, which went directly to Mullins, Trans-West had no entitlement to the funds paid to Mullins, which precluded the civil theft claim. He opined that because Southwest and Buchanan paid the full amount of the contract prices with Trans-West, the funds which Mullins received were outside the contracts (October 23, 2017 Order at pp. 29-30).

He also granted partial summary in favor of Southwest and Buchanan on the conversion claim, similarly reasoning that Southwest and Buchanan paid the contract prices to Trans-West, Trans-West never possessed any of the disputed payments, and the money transferred to Mullins was not the property of Trans-West over which Southwest and Buchanan exercised dominion or control (October 23, 2017 Order at pp. 31-32).

Thereafter, the parties confidentially settled the civil action, and the case was dismissed on September 27, 2017.

While the Court agrees with Judge Moore's conclusions on the breach of fiduciary duty, fraud, civil conspiracy claims, constructive trust, and unjust enrichment claims, the October 23, 2017 Order does not apply here or collaterally estop this Court on the civil theft claim because the parties were not the same there, as here.

Further, Southwest was not an employee and RV sales manager of Trans-West, owing a fiduciary duty of loyalty to Trans-West, who was entrusted to act honestly and not accept gifts or otherwise act in a manner in conflict with the interests of Trans-West, while being paid a handsome salary.

The doctrine of collateral estoppel does not apply here. Collateral estoppel bars the successive litigation of any issue of law or fact "once [it has] been determined by a valid and final judgment." *Ashe v. Swenson,* 397 U.S. 436, 443 (1970). The doctrine "prevents a party that has lost the battle over an issue in one lawsuit from relitigating the same issue in another lawsuit." *In re Corey,* 583 F.3d 1249, 1251 (10th Cir. 2009). Federal law governs the scope of the preclusive effect given to federal court decisions.

*Stan Lee Media, Inc. v. Walt Disney Co.*, 774 F.3d 1292, 1297 (10th Cir. 2014) (citation omitted).

For an issue to be collaterally estopped, the party invoking the doctrine has the burden of establishing four standards:

> (1) the issue previously decided is *identical* with the one presented in the action in question, (2) the prior action has been *finally adjudicated on the merits*, (3) the party against whom the doctrine is invoked was a *party or in privity with a party* to the prior adjudication, and (4) the party against whom the doctrine is raised had a *full and fair opportunity to litigate* the issue in the prior action.

*Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation*, 975 F.2d 683, 687 (10th Cir. 1992) (emphasis added) (citations omitted).

At least, two of the four factors are not present here and the Court holds that the doctrine, therefore, does not apply.  The issue previously decided, civil theft by Southwest of Trans-West's property, is not identical to the civil theft issue here because there were different parties involved; Southwest was not a manager and employee of Trans-West, owing fiduciary duties to Trans-West under Colorado state law.

Second, the prior action was confidentially settled before trial without any clear indication that the parties intended their settlement agreement to have preclusive effect and, therefore, not finally adjudicated on the merits.  *See e.g.*, *Arizona v. California*, 530 U.S. 392, 414, *supplemented,* 531 U.S. 1 (2000) ("[S]ettlements ordinarily occasion no *issue preclusion* (sometimes called collateral estoppel), unless it is clear, as it is not here, that the parties intend their agreement to have such an effect.") (emphasis in original).

## CONCLUSIONS OF LAW

Trans-West has asserted claims against Mullins under 11 U.S.C. § 523(a)(2)(A) for actual fraud, § 523(a)(2)(A) for false representation, § 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity, and § 523(a)(6) for willful and malicious injury.

Trans-West has asserted claims against Mrs. Mullins and sought to impose vicarious liability upon Mrs. Mullins for civil conspiracy to commit actual fraud under 11 U.S.C. § 523(a)(2)(A), false representations under § 523(a)(2), willful and malicious injury under § 523(a)(6), and for aiding and abetting fraud or defalcation while acting in a fiduciary capacity under § 523(a)(4).

Mullins was an employee of Trans-West.  Not a mere salesperson, but the RV sales manager, who, throughout the employment relationship, continually held himself out as a successful expert in the field.  As an employee, he owed a fiduciary duty of loyalty to Trans-West.  *See Jet Courier Serv., Inc., v. Mulei*, 771 P.2d 486, 491–94 (Colo. 1989).  One facet of the employee's duty of loyalty to his employer is the employee's "duty not to compete with the employer concerning the subject matter of his employment."  *Id.* at 492–93 (quoting Restatement (Second) of Agency § 393 (1957)).

28

## I.      Burden of Proof

Trans-West has the burden of proof to establish its claims under 11 U.S.C. § 523 by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 291 (1991).  A preponderance of the evidence standard means the burden of proof is met when the trier of fact determines that there is greater than a 50% chance that, based upon the evidence adduced at trial, the plaintiff's claims are true, and the defendant did, in fact, do the wrong which caused the damage.  *See In re Keeran*, No. 09-12021-J7, 2012 WL 1196531, at *7 (Bankr. D.N.M. Apr. 6, 2012).  To prove something by a preponderance of the evidence means to prove it is more likely true than not.  *United States v. Romero*, 747 F. App'x 717, 720 (10th Cir. 2018); Colorado Jury Instructions A. BURDENS of PROOF 3.1.

## II.     Existence of a Debt

The Court's dischargeability analysis begins with whether Mullins owes a debt to Trans-West.  *In re Thompson,* 555 B.R. 1, 8 (10th Cir. BAP 2016).  A debt is liability on a claim.  11 U.S.C. § 101(12).  A claim is a right to payment.  11 U.S.C. § 101(5).  The debt here is Mullins's fraudulent misappropriation of Trans-West's gross profits on sales and deferral of losses on purchases.  A party owes a debt to another party when the first party steals property of the second party.

Mullins claims that Trans-West was not damaged because the kickback funds were not Trans-West's property; rather, they were the property of the other parties (the other players in the Kickback Scheme) to the contracts.

Mullins argues that there is no debt because the money he received was from the wholesalers who "SPIFF'ed him" from their funds, with no set amounts, at their sole discretion.  He takes the Court for a fool.  In the case of *People v. Ferguson*, 701 P.2d 72 (Colo. App. 1984), a defendant impersonated restaurant staff and convinced a patron to pay him the amount billed to a thirty-two-person dinner party.  Ferguson was arrested after he left the restaurant, charged with felony theft, and convicted.  The Court found that the money taken from the restaurant was property of the restaurant because it represented payment for the food, drink, and service of the restaurant.  *Id.* at 73.

The same principle applies here with greater force.  Mullins was an employee of Trans-West who owed a fiduciary duty of loyalty.  He made misrepresentations on the purchase and sales contracts and was paid amounts owned by Trans-West by the other players, which should have been paid to Trans-West.  In effect, Mullins "intercepted" amounts due to Trans-West because Trans-West trusted Mullins.

Also, the criminal indictment alleged that Mullins, through deception, obtained and exercised control over a thing of value, namely cash, currency, and/or credit, owned by Trans-West, and that he used deceptive tactics to deprive Trans-West of funds related to the sale of RVs in the amount of at least $879,925 (Pl.'s Ex. 61, p. 6).

Mullins's reliance on the case of *In re Trovato*, 145 B.R. 575 (Bankr. N.D. Ill. 1991), for the proposition that Trans-West "received every penny that it bargained for" and that "the property he received belonged to third parties" (Pre-Trial statement, Doc. 82, p. 9), misses the point of an actual fraud claim perpetrated by an employee upon an employer.

29

To rule otherwise would encourage employees to engage in the type of illegal kickback scheme that occurred here.

In *Trovato*, the employee, among other things, overcharged customers of his employer for amounts above the commissions due to the employer for legal services contracts, while paying his employer the amount to which it was entitled under the legal services contracts.  In dismissing the employer's claim for non-dischargeability debt against the employee for fraud, the court found that it was the customers who were defrauded, not the employer.  The court concluded that there was no misrepresentation to the employer and that the employer was not damaged because the employer received its full contract commission on the overcharged accounts.  *Id.* at 581.

*Trovato* is easily distinguishable because Mullins did not overcharge third parties and keep the proceeds.  Here, Mullins, utilizing his position as the RV sales manager, submitted false purchase and sale contracts to Trans-West and either sold Trans-West's property for too low of a price or purchased property for Trans-West for too high of a price, thereby directly depriving Trans-West of its gross profits and inflating its losses under the false contracts, which falsely represented the fair market value of the RVs under both sides of the Kickback Scheme.

## III.   Actual Fraud

11 U.S.C. § 523(a)(2)(A) provides, in pertinent part, that a Chapter 7 debtor is not discharged from any debt for money or an extension of credit to the extent that such debt was obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

The Court begins the analysis with the actual fraud claim.  The Court finds that Mullins is liable to Trans-West for actual fraud in connection with the Kickback Scheme. Notably, the term "actual fraud" has been recently interpreted by the United States Supreme Court to encompass all "forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation."  *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016).

The Tenth Circuit Bankruptcy Appellate Panel stated that "[w]hen a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code." *In re Vickery*, 488 B.R. 680, 690 (10th Cir. BAP (Colo.) 2013) (quoting *In re Vitanovich*, 259 B.R. 873, 877 (6th Cir. BAP 2001)).

Actual fraud is not limited to misrepresentations or misleading omissions.  *Vickery*, 488 B.R. at 691 (citing *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000)).  In order to except a debt based on actual fraud, the creditor must prove: (1) a fraud occurred; (2) the debtor intended to defraud; and (3) the fraud created the debt that is the subject of the dispute.  *In re Jensen*, No. AP 17-01078, 2019 WL 2403105, at *8 n.63 (10th Cir. BAP (Colo.) June 7, 2019) (quoting *In re Glenn*, 502 B.R. 516, 531 (Bankr. N.D. Ill. 2013), *aff'd sub nom. Sullivan v. Glenn*, 526 B.R. 731 (N.D. Ill. 2014), *aff'd,* 782 F.3d 378 (7th Cir. 2015)).  The plaintiff need not establish reliance, because "reliance is relevant only when

the fraud takes the form of a misrepresentation." *Vickery*, 488 B.R. at 690 (internal quotation marks and citation omitted).

In reviewing the totality of the circumstances, the Court has identified a number of badges of actual fraud of the Kickback Scheme. The badges are applicable to both the actual fraud and false pretenses claims, are seemingly endless, and show Mullins's fraud and intent to defraud Trans-West. They include the following:

(i)     From the beginning, Mullins saw Trans-West as a "mark," because it was a wealthy company new in the RV business, and his immediate supervisor, Lyons, was busy managing many different aspects of Trans-West's businesses;

(ii)    Mullins lied at the inception of the relationship in his employment application by not disclosing a felony conviction, no matter how he tried to "sugar coat" it at trial, and he also lied about the size of Pinnacle's business;

(iii)   The kickbacks began immediately with his former business partner, Davis of Ranger, who sent Mullins six kickback checks in October 2011 and five kickback checks in November 2011;

(iv)    The staggering overall number and amount of checks involved;

(v)     The time frame extended from October 2011 until 2014, when Trans-West terminated Mullins's authority to sell RVs on a wholesale basis;

(vi)    He did not tell Eidsness, Lyons, Pettley, Land, or Kovac of his receipt of $879,000 in checks from Ranger, Texas RV/Neal's, or Southwest, thereby "hiding" the kickbacks;

(vii)   He never attempted to clarify his understanding of the employee manuals with Eidsness which prohibited Trans-West employees from receiving gifts or acting in conflict with the interest of Trans-West;

(viii)  He filed fraudulent tax returns with the Internal Revenue Service and Colorado Department of Revenue, concealing his receipt of the kickbacks and obtaining significant tax-free income;

(ix)    He called his business income in 2013, income for "consulting" in his 2013 federal income tax return;

(x)     The SPIFFs were, in fact, illegal kickbacks and did not have any of the characteristics of legal SPIFFs (well known to all, including Trans-West, paid by manufacturers, relatively small in amount, subject to 1099's, reported on tax returns, and taxes paid thereon);

(xi)    There was no set formula for the SPIFFs such as a percentage (no legitimate business does business in that manner);

(xii)    Most of the checks were in round dollar amounts, so they were not based on a percentage of sales or purchases (again, what legitimate business operates that way?);

(xiii)   He only amended his tax returns after he was indicted and before sentencing;

(xiv)   He funneled the kickbacks into his personal joint checking account, Pinnacle's bank account, Mullbuch's bank account, and through Mrs. Mullins, evidencing continuing intentional concealment;

(xv)    He alone negotiated the wholesale RV contracts and made material misrepresentations to Trans-West on purchase contracts he signed when he inflated purchase prices, purchasing RV inventory above fair market value, thereby delaying Trans-West's realization of deferred losses, and splitting the difference with the other players;

(xvi)   He alone negotiated the wholesale RV contracts and made material misrepresentations to Trans-West on sale contracts when he deflated sale prices, selling RV inventory below fair market value, and splitting the difference with the other players;

(xvii)  The transaction lines on most of the checks were blank, which is extraordinary considering the amounts involved; another example of fraudulent concealment;

(xviii)  The only witnesses who testified that these were legal SPIFFs were the other players, whose deposition testimony was demonstrably not credible;

(xix)   He and his wife spent the ill-gotten gains like "drunken sailors" on consumer purchases;

(xx)    He created a "smokescreen" by alleging that no one understood his complex transactions involving multiple vehicle deals;

(xxi)   The first two players were Texas buddies, and he cultivated Southwest as the last player in the Kickback Scheme to feed his greed;

(xxii)  He admitted his conduct violated Trans-West's employee handbooks;

(xxiii) He pled guilty to felony tax fraud in failing to report the kickbacks as income or pay taxes on them;

(xxiv)  He was unable to produce any documents to establish the business expenses he claimed on his fraudulent, original 2013 and 2014, income tax returns;

(xxv)  The massive amount of cash deposits, especially where he was unable to produce any documents to establish the source of the deposits, including his claims that some of the cash was from the proceeds of gambling;

(xxvi)  He was unable to produce any documents to show that any of the kickbacks were from leftover Pinnacle RV deals;

(xxvii) He was unable to produce any documents to establish that any of the kickbacks were from the sale of miscellaneous Pinnacle personal property;

(xxviii) He changed his story that the kickbacks were SPIFFs, to assert that they were gifts, finder's fees, or broker's fees from the other players;

(xxix)  He failed to report the kickbacks on a sworn residential loan application for fear that he might have to show the source of the additional income;

(xxx)  Trans-West lost substantial amounts of money when he was RV sales manager in 2011-2015 but earned a profit in every year after he was terminated;

(xxxi)  In response to a question of whether he told Pettley about the SPIFFs, he committed a slip of the tongue when he testified under oath, "Mr. Pettley was a salesperson for me, so I didn't disclose **my personal business at all**;"

(xxxii) He committed a second slip of the tongue when he testified, "And, as far as the used stuff, you know, Andrew Lyons and I talked about that openly.  It was—there wasn't like a—**I didn't do deals in the back office or out the back of the building**," when that was exactly what Mullins was doing (Trial Tr. day 3, 70:20-22);

(xxxiii) He claimed he was the victim because Lyons approved every wholesale deal and knew everything he was doing, when he concealed the substantial kickbacks from Lyons (why would his authority to make wholesale sales be revoked in late 2014 by Trans-West if he did not have such authority?); and

(xxxiv) Finally, when confronted by Trans-West, he initially vehemently denied the Kickback Scheme until he was presented with the evidence, and then he changed his explanation to come up with an excuse for the kickbacks.

Here, the Kickback Scheme deprived Trans-West of valuable property rights; the gross profit margin on sales of RVs to which it was entitled from the sale of inventory below fair market value, and the losses due to Mullins's purchase of inventory above fair market value.

Instead of having the wholesale RV dealers pay the gross profit margin to Tran-West, Mullins conspired with Davis, Cecil, and Buchanan to have them pay the gross profit margin to Mullins.  Indeed, the uncontradicted evidence proffered by Harrison was that most of Mullins's wholesale sales either broke even or were at a loss, where the sales of honest Trans-West salespeople created a 7-8% gross profit margin for Trans-West.

The Kickback Scheme was an actual fraud perpetrated on Trans-West, causing actual damages of at least $1 million.

## IV.   False Pretenses

On the claim for relief for false representations under 11 U.S.C. § 523(a)(2)(A), a creditor generally must prove the following:

> (1) the debtor made a false representation; (2) with the intent to deceive the creditor; (3) the creditor relied on the false representation; (4) the creditor's reliance was justifiable; and (5) the false representation resulted in damages to the creditor.

*In re Denbleyker*, 251 B.R. 891, 895 (Bankr. D. Colo. 2000) (citing *Field v. Mans*, 516 U.S. 59, 71 (1995)); *Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996).  "[E]xceptions to discharge are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor."  *Bellco First Federal Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997) (citation omitted).

The Court finds that Mullins is liable to Trans-West for a non-dischargeable debt for false pretenses.  Here, Mullins made false representations on each purchase and sale contract involving Ranger, Texas RV/Neal's, and Southwest.  In the case of the sale contracts, he falsely represented the value of the RVs and sold them for a price lower than fair market value.  In the case of the purchase contracts, he falsely represented the value of the RVs and purchased them for a price above fair market value.

Mullins's fraudulent intent is established by the thirty-three badges of fraud identified above.

"The fourth element of the § 523(a)(2)(A) test requires the creditor's reliance to be 'reasonable.' The appropriate standard is not 'reasonableness' in the sense of whether an objectively reasonable person would have relied upon the debtor's false representations. Rather, the inquiry is whether the actual creditor's reliance was 'justifiable' from a subjective standpoint."  *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 791 (10th Cir. 2009) (citing *Field*, 516 U.S. at 74–75).

Trans-West's reliance on Mullins was subjectively justified because Mullins held himself out as an expert in the RV industry and held the title of RV sales manager.  When questioned by Lyons about the losses, he always made a promise of better things to come.  Lyons testified that Trans-West trusted their salespeople to get the best prices (Trial Tr. day 2, 31:22-32:1).

## V.   Breach of Fiduciary Duty

11 U.S.C. § 523(a)(4) provides that a Chapter 7 debtor is not discharged for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.  In order to prevail on a claim for breach of fiduciary duty as a non-dischargeable debt, the creditor

must establish by a preponderance of the evidence that: (1) a fiduciary relationship existed between the debtor and the creditor, (2) the debt owed to the creditor is attributable to fraud or defalcation committed by the debtor in the course of the fiduciary relationship and, (3) the debtor acted with a culpable state of mind. *In re Karch*, 501 B.R. 403, 407 (Bankr. D. Colo. 2013).

The United States Supreme Court has held that defalcation requires an intentional wrong such that the fiduciary must have known that the conduct is improper or consciously disregarded a substantial and unjustifiable risk that the conduct will violate a fiduciary duty. *Bullock v. BankChampain, N.A.,* 569 U.S. 267, 274 (2013).

Whether a debtor is a fiduciary is determined by federal law, although state law is relevant to the inquiry. *Young*, 91 F.3d at 1371. In order to establish a fiduciary duty, a creditor must prove the existence of either an express or technical trust. *Id.*

Under Colorado law, creation of an express trust requires unequivocal and unambiguous language. *Morgan v Wright,* 156 Colo. 411, 415 (1965) (citation omitted). Here, although Mullins owed a fiduciary duty as an employee to Trans-West, there was no express trust leading to an actionable claim in favor of Trans-West under 11 U.S.C. § 523(a)(4).

While Trans-West argued in its Trial Brief (Doc. 102, November 5, 2019, at p. 13), that Mullins is also liable under 11 U.S.C. § 523(a)(4) for a non-dischargeable debt for embezzlement, it did not plead an embezzlement claim in its second amended complaint, nor was it contained in the Pre-Trial Statement. Whether to conform pleadings to the evidence is a matter of discretion to the trial court. *Green Country Food Mkt., Inc. v. Bottling Grp., LLC,* 371 F.3d 1275, 1281 (10th Cir. 2004). Here, it is not fair to Mullins to allow the embezzlement claim because it was not pled in the second amended complaint or contained in the Pretrial Statement.

Thus, the Court dismisses the third and seventh claims for relief.

## VI.   Willful and Malicious Injury

The Court finds that Mullins is also liable to Trans-West for a non-dischargeable debt for willful and malicious injury. 11 U.S.C. § 523(a)(6) provides that a Chapter 7 debtor is not discharged for willful and malicious injury by the debtor to another entity or the property of another entity. The creditor must establish that the conduct of the debtor was "willful and malicious" and caused an injury to an entity or the property of an entity.

Non-dischargeability under 11 U.S.C. § 523(a)(6) requires both a "willful injury" and a "malicious injury." *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) ("Without proof of *both*, an objection to discharge under that section must fail."). The United States Supreme Court has held that the term "willful" requires proof of a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury. *Kawaauhua v. Geiger*, 523 U.S. 57, 61 (1998). The Tenth Circuit has held that "the term 'malicious' requires proof 'that the debtor either intend[ed] the resulting injury or

intentionally [took] action that [was] substantially certain to cause injury.'" *Panalis*, 357 F.3d at 1129 (quoting *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164 (11th Cir. 1995)).

Mullins's conduct was both willful and malicious. Thus, it also constitutes civil theft. The Kickback Scheme was set up before and started as soon as he arrived in Colorado. It lasted for over three years.  It only ended because there was an honest salesperson who blew the whistle.  The number of checks and cash transfers reflects the willful and malicious nature of his conduct.

It was willful because Mullins intended to injure Trans-West.  It was malicious because he embarked upon a course of conduct intending to injure Trans-West and intentionally took action that was substantially certain to cause the injury.  His conduct, in this commercial context, could not have been any more willful and malicious and certainly would have caused the collapse of a smaller company.  Trans-West was able to withstand the losses, which was why the Kickback Scheme lasted three years; that, and Trans-West's justifiable reliance on Mullins.

Mullins was present at weekly sales meetings at which the continuing lack of profitability was a main topic (Trial Tr. day 1, 89:5-24; Trial Tr. day 2, 44:11-23). In the meetings, he sat with Lyons and others, knowing that Trans-West's losses were exponentially increasing due to his Kickback Scheme.  At all times, he duplicitously continued to conceal his willful and malicious conduct.

Trans-West further requests the Court to treble the damages for civil theft pursuant to C.R.S. §§ 18-4-401 and 18-4-405 for the willful and malicious injury claim and award Trans-West its attorney's fees and expenses under C.R.S. § 18-4-405.

C.R.S. § 18-4-401 provides:

> (1)  A person commits theft when he or she knowingly obtains, retains, or exercises control over anything of value of another without authorization or by threat or deception; or receives, loans money by pawn or pledge on, or disposes of anything of value or belonging to another that he or she knows or believes to have been stolen, and:
> (a) Intends to deprive the other person permanently of the use or benefit of the thing of value;
> (b) Knowingly uses, conceals, or abandons the thing of value in such manner as to deprive the other person permanently of its use or benefit;
> (c) Uses, conceals, or abandons the thing of value intending that such use, concealment, or abandonment will deprive the other person permanently of its use or benefit;
> (d) Demands any consideration to which he or she is not legally entitled as a condition of restoring the thing of value to the other person; or
> (e) Knowingly retains the thing of value more than seventy-two hours after the agreed-upon time of return in any lease or hire agreement.

36

Under Colorado law, claims for theft can be pursued in a civil action pursuant to C.R.S. § 18-4-405:

> All property obtained by theft, robbery, or burglary shall be restored to the owner, and no sale, whether in good faith on the part of the purchaser or not, shall divest the owner of his right to such property. The owner may maintain an action not only against the taker thereof but also against any person in whose possession he finds the property. In any such action, the owner may recover two hundred dollars or three times the amount of the actual damages sustained by him, whichever is greater, and may also recover costs of the action and reasonable attorney fees; but monetary damages and attorney fees shall not be recoverable from a good-faith purchaser or good-faith holder of the property.

The elements of theft under C.R.S. § 18-4-401 parallel the standards applied to determine whether an injury is willful and malicious.  Taking another's valuable property knowingly and deliberately and intending the injury of depriving them of its use and benefit, which is certainly reasonably foreseeable, falls within the terms willful and malicious. *See In re Tague,* 137 B.R. 495, 502 (Bankr. D. Colo. 1991); *Waknin v. Teta (In re Teta)*, No. 10-26493-MER, 2011 WL 2435948 (Bankr. D. Colo. June 16, 2011).

A defendant liable for civil theft necessarily meets the requirements of willful and malicious injury to the property interest of a plaintiff for the purposes of dischargeability under 11 U.S.C. § 523(a)(6). *C-Ball Ventures, LLC v. Oltmann (In re Oltmann)*, 505 B.R. 311, 318 (Bankr. D. Colo. 2014).  "The Colorado Court of Appeals held in *Steward Software Co. v. Kopcho* that 'an award of attorney fees to a prevailing plaintiff on a civil theft claim is mandatory.'  Accordingly, the bankruptcy court had no discretion whether to award attorneys' fees under the civil theft statute…."  *Arnold v. Arnold (In re Arnold)*, No. CO-15-031, 2016 Bankr. LEXIS 794, at *11 (B.A.P. 10th Cir. Mar. 15, 2016).

## VII.    Mrs. Mullins

Under Colorado law, the five elements of civil conspiracy include: (1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds in the object or course of action, (4) an unlawful overt act, and (5) damages as a proximate result thereof. *Nelson v. Elway*, 908 P.2d 102, 106 (1995).  The purpose of the conspiracy must involve an unlawful act or unlawful means.  *Id.*

Here, Mrs. Mullins extensively and overtly participated in the Kickback Scheme, including receiving significant checks and making significant cash deposits.  She spent the fruits of the fraud at a breathtaking rate over several years.  She was an employee of Pinnacle.  She signed the fraudulent tax returns and loan application.  The object was to defraud Trans-West.

Her actions were more than sufficient to find that she conspired with Mullins to commit actual fraud, false pretenses, and willful and malicious injury on Trans-West. Although she testified that she would never engage in a wrongful act (Trial Tr. day 3,

104:13-20), Mrs. Mullins cannot escape the facts of the checks made payable to Mullbuch and/or her personally, the deposits she made of significant cash, the consumer purchases, the length of time, and the amount of money transferred. She has a college degree and worked as an outreach counselor at a community college (Trial Tr. day 3, 101:23-102:5). She had her own business. In view of the amount of money involved and the time frame, she had to know that the funds were not just from gambling.

If she was an innocent bystander and not a participant, should she not, at some point, have asked Mullins, "what is going on here, where are you getting all this money?"

## VIII.   Damages

The Court finds that Trans-West has proven damages of lost gross profits with reasonable certainty in the amount of the kickback checks, $879,000, and in the amount of the kickback cash, $175,000, by far more than a preponderance of the evidence, through the testimony and summaries of Harrison.

Lost profits must be proven "with reasonable certainty." *Vanderbeek v. Vernon Corp.*, 50 P.3d 866, 873 (Colo. 2002). "The purpose of the reasonable certainty rule is to avoid making compensatory damages awards for lost profits which are fabricated or based on mere conjecture or speculation." *Id.* (internal quotation marks and citation omitted). Lost profits cannot be proven with evidence that is "speculative, remote, imaginary, or impossible to ascertain." *Colorado Nat. Bank of Denver v. Friedman*, 846 P.2d 159, 174 (Colo. 1993) (citations omitted). A claimant meets the requirements of certainty to show lost profits when it "would have had a substantial and measurable chance of a profit without chance of loss if the defendant had not acted improperly." Restatement (Second) of Torts § 912 (1979).

Trans-West has more than adequately established actual damages in the amount of $1 million with reasonable certainty.

## CONCLUSION

Based upon the above findings of fact and conclusions of law,

IT IS ORDERED that judgment shall enter in favor of Trans-West, Inc. and against Jeffrey Thomas Mullins and Charity Dawn Mullins, jointly and severally, for a non-dischargeable debt in the amount of $1 million, under 11 U.S.C. § 523(a)(2)(A) for actual fraud, § 523(a)(2)(A) for false representations, and § 523(a)(6) for willful and malicious injury.

IT IS FURTHER ORDERED that judgment shall enter in favor of Plaintiff Trans-West, Inc. and against Defendants Jeffrey Thomas Mullins and Charity Dawn Mullins, jointly and severally, for a non-dischargeable debt under C.R.S. § 18-4-405 for treble damages for civil theft in the amount of $3 million.

IT IS FURTHER ORDERED that judgment shall enter in favor of Plaintiff Trans-West, Inc. and against Defendants Jeffrey Thomas Mullins and Charity Dawn Mullins,

jointly and severally, for a non-dischargeable debt under C.R.S. § 18-4-405 for attorney's fees and expenses.

IT IS FURTHER ORDERED that judgment shall enter in favor of Plaintiff Trans-West, Inc. and against Defendants Jeffrey Thomas Mullins and Charity Dawn. Mullins, jointly and severally, for costs incurred in this adversary proceeding under 28 U.S.C. § 1920 and Fed. R. Bankr. P. 7054.

IT IS FURTHER ORDERED that judgment shall enter in favor of Defendants Jeffrey Thomas Mullins and Charity Dawn Mullins and against Plaintiff Trans-West, Inc., dismissing the third and seventh claims for relief under 11 U.S.C. § 523(a)(4) with prejudice.

IT IS FURTHER ORDERED that the funds, and any accrued interest thereon, held by the escrow agent pursuant to the stipulation entered into in the State Court Case shall be released to Plaintiff Trans-West within thirty days of the date of this Order.

IT IS FURTHER ORDERED that within thirty days of the date of this Order, Plaintiff Trans-West, Inc. shall file an affidavit of attorney's fees and expenses incurred in connection with this adversary proceeding, for consideration by the Court subject to the provisions of L.B.R. 2016-1.

IT IS FURTHER ORDERED that within thirty days of the date of this Order, Plaintiff Trans-West, Inc. shall file a bill of costs containing its total taxable costs incurred in connection with this adversary proceeding.

IT IS FURTHER ORDERED the Clerk of the Court shall enter judgment accordingly.

Dated this __30th__ day of September, 2020.

BY THE COURT:

_____
Joseph G. Rosania, Jr.
United States Bankruptcy Judge